UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

---

UNITED STATES OF AMERICA,

              -against-

JON CRUZ

             Defendant

15 CR 338

---

## SENTENCING MEMORANDUM
## FOR JON CRUZ

Steve Zissou
Steve Zissou & Associates
4240 Bell Blvd # 302
Bayside, NY 11361

Deborah Colson
Colson Law PLLC
80 Broad Street, 19th Floor
New York, NY 10004

*Attorneys for Jon Cruz*

Dated:   New York, New York
         June 21, 2017

# I.

## INTRODUCTION

Mr. Cruz pled guilty in September 2016 to receipt of child pornography in violation of 18 U.S.C. § 2252A(a)(2)(B). He is scheduled to be sentenced on June 28, 2017. He faces a mandatory minimum sentence of 60 months. The Probation Department estimates an advisory Guidelines range of 135 to 168 months.

We write to request the minimum sentence of 60 months. Mr. Cruz has no prior criminal record, and his personal history and post-offense rehabilitation warrant the full extent of the Court's leniency. Prior his arrest, Mr. Cruz was a nationally recognized debate coach at the Bronx High School of Science and a legendary figure in the school's social studies department. In the many letters attached to this memorandum, those who know him best attest to his generosity of spirit, love of teaching, and dedication to his students.

Mr. Cruz is humbled and humiliated by his offense and takes full responsibility for his conduct. Since his arrest in March 2015, he has sought treatment for his mental health problems and worked hard to make amends. Shortly after his release on bail, Mr. Cruz began intensive psychotherapy with Erik Mercer, L.C.S.W. Several months later, he entered individual and group sex offender treatment and was prescribed medication to treat his anxiety and Obsessive Compulsive Disorder. Mr. Cruz was remanded following his guilty plea but has continued weekly psychotherapy with Mr. Mercer at the MDC.

Over the course of his treatment, Mr. Cruz has gained significant insight into the origins of his offense and the psychological and emotional impact of his conduct on his students and victims. His use of antidepressant medication has further enabled a decrease in anxiety, obsessional thinking, and compulsive behaviors. Given the speed and significance of his progress, Mr. Cruz's doctors believe his risk of recidivism is very low.

1

A sentence of 60 months is sufficient to provide just punishment and promote Mr. Cruz's respect for the law. Following his release from prison, Mr. Cruz will be required to register as a sex offender, and his employment options and living arrangements will be severely limited. He will never teach again and will probably lose his apartment. Moreover, because dozens of articles about the case are available online, Mr. Cruz may never overcome the stigma of his crime.

Attached in support of this application are:

- A progress report and evaluation prepared by treating psychotherapist Erik Mercer, L.C.S.W., dated January 6, 2016 (Ex. A),
- An addendum to Mr. Mercer's initial report, dated June 18, 2017 (Ex. B),
- A psychiatric evaluation and diagnostic formulation dated December 3, 2015, prepared by treating psychiatrist Gregory Alsip, M.D., Ph.D. (Ex. C),
- A treatment summary dated December 31, 2015, and update letter dated June 14, 2017, prepared by cognitive behavioral therapist Meg S. Kaplan, Ph.D. (Ex. D),
- A treatment summary dated December 2, 2015, and update letter dated June 16, 2017, prepared by psychologist and group therapist Douglas Martinez, Ph.D. (Ex. E),
- A psycho-sexual evaluation and risk assessment report dated June 14, 2017, prepared by psychiatrist Richard B. Krueger, M.D. (Ex. F),
- A pre-pleading memorandum dated January 13, 2016, prepared by forensic mitigation specialist Reynaldo Cusicanqui (Ex. G),
- The results of a polygraph examination conducted by certified polygraph examiner Ronald Barndollar (Ex. H),
- A letter from Mr. Cruz (Ex. I),
- Letters from former students, mentors, and colleagues (Ex. J),
- Letters from family members and friends (Ex. K),
- The plea agreement signed by the parties in *United States v. Anthony Weiner,* 17 Cr. 307 (Ex. L), and
- A short video about Mr. Cruz (Ex. M).[1]

## II.

## PERSONAL HISTORY AND CHARACTERISTICS

Mr. Cruz is a smart, highly competent, thirty-three year old man with a strong work ethic and lifelong love of debate. His wit, kindness, and generosity have earned him a wide circle of friends and buoyed those around him during difficult times. The truth is, however, that Mr. Cruz

---

[1] The video will be hand delivered to the Court.

grew up in a profoundly dysfunctional home marked by ████████████████████, and his cheerful demeanor masks intense personal suffering. In part because of his difficult childhood, Mr. Cruz battles several mental disorders that went untreated prior to his arrest. His current therapists observe a direct link between his offense conduct and these disorders.

Despite his middle-class upbringing, Mr. Cruz's childhood was chaotic and confused.



. His parents' personal difficulties created "an environment of chronic stress for Jon" and triggered feelings of anxiety and low self-esteem. Ex. A at 2. Mr. Cruz recalls feeling nerdy and physically inferior throughout grade school. *Id.* These feelings intensified as a teenager when Mr. Cruz came out as gay, and his mother refused to accept his homosexuality. *See* Ex. G at 5. Mrs. Cruz insisted that her son was going "through a phase" and took him for sessions with her own therapist, who tried to convince him that he was attracted to girls. *Id;* PSR ¶ 75.

Mr. Cruz's struggles with low self-esteem were deeply private. Though he suffered on the inside, publicly he achieved significant academic and extra-curricular success. He excelled in high school where he was president of the debate team and a founding member of the moot court and constitutional law team. *See* Ex. G at 7-8. At Vassar College, Mr. Cruz wrote for the student newspaper and served on the History Majors' Committee. *Id.* at 8.

Mr. Mercer believes that Mr. Cruz's degraded and split sense of self led him to seek out exploitative and masochistic relationships. *See* Ex. A at 5-6. His first such relationship began in grade school with a classmate who was popular and athletic and to whom Mr. Cruz was physically attracted. Mr. Cruz wanted to be the boy's slave; he did the boy's homework and let the boy cheat off his tests. As a teenager, Mr. Cruz realized that he could replicate this relationship with others by creating a fictional online persona. He created his first such persona at the age of twelve. After this, he entered chat rooms on a regular basis, searching for athletes and popular boys his own age and offering them homework help, gifts, and money.  According to Mr. Mercer, "[t]he appeal of a false identity was heightened by Jon's emerging understanding of his homosexuality. He did not feel safe to come out of the closet, but he could safely be gay behind the mask of a fictional persona." Ex. A at 6.

The template created by these early online relationships continued into college and adulthood. Mr. Cruz had very few sexual experiences as a young adult, and eventually he developed a fear of sexual intimacy. *See* Ex. A at 7. Mr. Mercer believes that Mr. Cruz turned to internet role play because it "precluded the possibility of ever meeting the boys with whom he was communicating." *Id.*

As time passed, Mr. Cruz's online conduct became increasingly obsessive and ritualistic. It consumed much of his free time and prevented him from developing authentic romantic connections. But it never impacted his professional life. On the contrary, the split between Mr. Cruz's public and private personas widened over time.

Upon graduation from college, Mr. Cruz was hired as the debate coach at Bronx Science. Under his tutelage, the debate team grew to be the largest and highest ranking team in the country. Mr. Cruz's students won hundreds of trophies. But victory was never his goal; inclusion

was. "Mr. Cruz genuinely believed that everyone who wanted to do debate should be allowed to do so," writes former student Victor Yeung. *See* Ex. J (Victor Yeung letter). Mr. Cruz did not hold tryouts. Anyone who wanted to join the team was offered a spot and permitted to compete. "Jon was evenhanded with all," explains one parent. *Id.* (Marilyn Teleky letter). He "involv[ed] every member of the team in activities whether the student was a standout or nothing special; they were all made to feel special." *Id.* "[T]he debate team offered a kind of neutral space where the constant mental pressure of being a teenager could be shelved for a few hours," adds Max Weinreich. "Instead, what mattered on the debate team was character." *Id.* (Max Weinreich letter).

Not only did Mr. Cruz foster inclusion, but he worked hard to recognize each student's individual talents and contributions. "In most group settings, Mr. Cruz always had something positive to point out about an effort, comment, or idea that someone had or that he'd heard from someone we'd known," explains Minnie Mangafas. *Id.* (Minnie Mangafas letter). "When it came to making people feel good about themselves, he spared nothing. It radiated from his character all the time." *Id.* Julie Flanders, a parent, echoes the same sentiment:

> I saw Jon's influence on many of Julian's friends—some of whom were struggling or dealing with very serious situations with a lack of parental support. Jon brought out the best in these kids with his high standards, fantastic humor, and his complete belief in their abilities. Jon Cruz has literally saved the lives of kids and has put kids who were at risk back on track.

*Id.* (Julie Flanders letter).

During his tenure, Mr. Cruz was the only openly gay faculty member at Bronx Science, and to the many gay students who confided in him, he provided a safe haven and an understanding, non-judgmental ear. Sinan Ziyalan recalls one occasion as a sophomore when he "saw a fellow student running past me with eyes soaked and bloodshot….This student had come

out to Mr. Cruz in room 203 in broad daylight. Out of all of his friends and family he had come to Mr. Cruz in his time of confusion and need." *Id.* (Sinan Ziyalan letter). "Speaking specifically as someone who struggled enormously with coming to terms with my sexuality," writes Alexander Tablan, "Jon was the best person to come out to and make me feel confident and comfortable in my own skin….[H]e always remained a source of invaluable advice and sound reason as I navigated through my early stages of gay adulthood. And I know that he has been equally helpful to others in similar positions…." *Id.* (Alexander Tablan letter).

Over the years, Mr. Cruz achieved national recognition and accumulated numerous accolades, including the National Speech & Debate Association Coach of the Year (2013), the National Speech & Debate Association Distinguished Service Award (2013), the Blake Outstanding Coach Award (2012), the National Debate Coaches Association Educator of the Year Award (2010), the Key Coach of the Barkley Forum for High Schools (2008), and the Michael Bacon Coaching Award (2005). *See* Ex. G at 10-11 (listing additional achievements and awards). Privately, however, Mr. Cruz continued to experience intense anxiety, a poor body image, and fear of his own sexuality. This private loathing pervaded every aspect of his life and formed the basis for his offense conduct described below.

### III.

### NATURE AND CIRCUMSTANCES OF THE OFFENSE

The nature of the offense is undisputed. Mr. Cruz chatted and texted with teenage boys, sometimes in a sexual manner, and he paid a number of them in gift cards to send him photographs. PSR ¶ 43. Many of the photographs were innocuous, but some boys sent images of their naked bodies, and others sent images of their feet and/or penises. Mr. Cruz located the boys through social media and lied to them about his identity, adopting a fictional alias and using the image of a former student as a cover. *Id.* at ¶ 38. He repeatedly fixated on heterosexual "jocks"

who he imagined could bully and humiliate him, and his narrative was always the same—he posed as a nerdy teenager willing to do their homework and pay them for photographs. He began these chats as a teenager and continued them for years, including while he was employed at Bronx Science. *Id.* at ¶ 43. Mr. Cruz did not download commercial child pornography from the internet or participate in chat rooms devoted to child pornography. He did not sell, trade, or share pornographic photographs. He did not meet or attempt to meet the boys with whom he chatted. And he did not have physical sexual contact with a minor. *See* Ex. G (results of polygraph examination).

The FBI located thirty pornographic photographs on Mr. Cruz's computer and identified eight minor victims. PSR ¶¶ 42, 45. All of the victims were teenagers. The assigned case agent believes that one, Victim 4, was 12 or 13 years old. S*ee id.* at ¶ 42. But the government has no proof of the boy's age, and defense experts who reviewed the photographs have determined that each of the boys depicted—including Victim 4—was post-pubescent.

Mr. Cruz accepts full responsibility for his conduct. He made a lengthy confession to the FBI agents who arrested him and allowed them access to his computer. PSR ¶ 43. He reiterated his remorse during his Presentence Interview, *see id.* at ¶ 50, and again in his letter to the Court: "I am responsible for my crimes, and I am the sole person responsible. I spent two decades building justifications on top of other justifications, furthering myself from the depravity of my behavior. In the more than two years since my arrest, I've come to see how wrong my rationalizations were." Ex. I at 3.

Needless to say, Mr. Cruz's family and friends were shocked to learn of his behavior and devastated by the depth of his private suffering. But their love and admiration has never wavered. Countless students continue to describe Mr. Cruz as the "best," most "passionate,"

most "dedicated" and "inspirational" teacher they ever had. *See* Ex. H. Dozens of supporters attended his guilty plea, and dozens more have written to the Court. *See* Ex. J, K.

## IV.

## A SENTENCE OF 60 MONTHS IS SUFFICIENT BUT NOT GREATER THAN NECESSARY TO SATISFY THE GOALS OF SENTENCING

Section 3553(a) of Title 18 provides that "[t]he court shall in every case impose a sentence sufficient, but not greater than necessary to comply with the purposes set out in paragraph (2) of this subsection." 18 U.S.C. § 3553(a). This provision, known as the parsimony clause, applies at every federal sentencing "except as otherwise specifically provided." 18 U.S.C. § 3551(a). Indeed, the command of the parsimony clause defines this Court's "overarching duty." *Pepper v. United States*, 131 S.Ct. 1229, 1243 (2011).

Among the factors to be considered under § 3553(a) are (1) the nature and circumstances of the offense, (2) the history and characteristics of the defendant, and (3) "the need for the sentence imposed—(A) to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense; (B) to afford adequate deterrence to criminal conduct; [and] (C) to protect the public from future crimes of the defendant." 18 U.S.C. § 3553(a).

As the Supreme Court reaffirmed in *Pepper*, the sentencing judge is to "consider every convicted person as an individual and every case as a unique study in the human failings that sometimes mitigate, sometimes magnify, the crime and the punishment to ensue." *Pepper,* 131 S.Ct. at 1240 (quoting *Koon v. United* States, 518 U.S. 81, 113 (1996)). While the guidelines are the "starting point and the initial benchmark," the Court "may not presume that the Guidelines range is reasonable." *Gall v. United States,* 128 S.Ct. 586, 596-97 (2007). Rather, the judge is

directed to make an "individualized assessment" of the sentence warranted "based on the facts presented." *Id*. at 597.

Several factors warrant leniency here.

### 1. Mr. Cruz Has Demonstrated Extraordinary Post-Offense Rehabilitation

First, in the more than two years since his arrest, Mr. Cruz has embarked on a course of extraordinary rehabilitation, showing both a desire and ability to lead a law abiding life. While he cannot undo what is already done, Mr. Cruz is taking every possible step to ensure that he never breaks the law again.

#### a. *Psychotherapy with Erik Mercer, L.C.S.W.*

In March 2015, just days after he was released on bail, Mr. Cruz voluntarily entered psychotherapy with Erik Mercer, L.C.S.W.  PSR ¶ 86. Over the past two years, Mr. Cruz and Mr. Mercer have met for hundreds of hours, including during multiple sessions at the MDC. Together they have mined Mr. Cruz's personal history and characteristics and uncovered the origins of his offense.

Before commencing therapy with Mr. Mercer, Mr. Cruz had never disclosed the full extent of his online relationships to anyone. He underwent psychoanalysis for several years prior to his arrest but did not have a trusting relationship with his doctor. PSR ¶ 85. Nor, given the nature of psychoanalysis, did the doctor appropriately challenge him. Ex. I at 3. The unveiling of his authentic self to Mr. Mercer has been incredibly powerful for Mr. Cruz. "As a result of my work with him [Mr. Mercer], I have accepted that I have an illness, and I have committed myself to attempt to understand it as best as possible. I have also worked to reconcile negative feelings about myself and my identity, feelings with which I have struggled since my childhood….I know myself better now, and I feel more confident…." *Id.* at 2-3.

Over the course of therapy, Mr. Cruz has also come to understand the gravity of his misconduct. Before his arrest, he had become so immersed in role-play that he had lost the ability to recognize his wrongdoing. *See* Ex. A at 7. "[I]it was incredibly difficult for me to empathize with my victims because, through the lens of the personalities I assumed online, these athletes could not be victims. They were the cool kids…." Ex. I at 4. With Mr. Mercer's help, however, Mr. Cruz has confronted his conduct head on:

> Prior to my arrest, I told myself that I didn't introduce the idea of taking revealing selfies to these teenagers because they often bragged about sexting with their girlfriends. But in therapy, I've realized how convoluted my rationalization had been. Those were their girlfriends and their girlfriends were age-appropriate peers. Also, through my actions, I was encouraging them to commodify their bodies.

*Id.* at 5. "Most of all, my actions have likely instilled in these teenagers profound doubts about themselves. They no doubt feel very vulnerable. They are no doubt less trusting of their own judgment. I'm not sure I can enumerate what all of their doubts might be. And that's what troubles me the most." *Id.* at 6.

Mr. Cruz has also begun to relate to people in a more authentic manner and to repair fractured relationships with family and friends, both of which are essential to his long-term success. *See* Ex. A at 9. "He has been direct with his family and friends about his offense conduct without becoming obsessive about their reactions," explains Mr. Mercer. Ex. B at 1. "The public grandiosity and private loathing that characterized Jon's life before his arrest have been redefined and integrated." *Id.* at 2.

b. *Psychopharmacology with Gregory Alsip, M.D., Ph.D.*

Mr. Cruz's struggle with anxiety intensified in the months following his arrest as he came to terms with his offense and returned to live in his parents' home. In May 2015, when Mr. Cruz's suffering became extreme, Mr. Mercer suggested that he meet with psycho-

pharmacologist Gregory Alsip, M.D., Ph.D. Over the course of several therapeutic sessions, Dr.

Alsip diagnosed Mr. Cruz with OCD, Obsessive Compulsive Personality Disorder, and

Unspecified Paraphilic Disorder. *See* Ex. C at 4. His diagnosis was based on Mr. Cruz's

description of his negative childhood experiences, ███████████████████████████,

observations of Mr. Cruz's obsessive thoughts, including sexual obsessions, and descriptions of

his compulsive behaviors, such as excessive texting and uncontrolled spending. *See id.* The OCD

diagnosis was confirmed with the administration of the Yale-Brown Obsessive Compulsive

Scale (Y-BOCS), which is the "gold standard for diagnosis and assessment of OCD." *Id.*  Mr.

Cruz scored a 40, which Dr. Alsip describes as "extreme" and "highly significant." *Id.*

In June 2015, Dr. Alsip prescribed Brintellix, an anti-depressant medication also used to

treat OCD. Mr. Cruz had a remarkably positive response to the medication. Within a month, he

reported "a significant decrease in both obsessional thinking and compulsive behavior" and a

further reduction in anxiety and stress. Ex. C at 5. Dr. Alsip noted additional gains over the

following six weeks, describing Mr. Cruz as more "resilient," "focused," and "engaged" in

therapy. *Id.* at 11. By August, Mr. Cruz reported the "complete absence of self-destructive

thoughts or desires." *Id.*  When Dr. Alsip re-administered the Y-BOCS on August 15, 2015, Mr.

Cruz received a score of 21, moving him from the "extreme" to "moderate" category.  *Id.*

Because Brintellix is not on the BOP formulary, Mr. Cruz's prescription to the drug was

discontinued when he entered the MDC. But he has since started on Citalopram, PSR ¶ 86, a

similar medication with the same therapeutic effects.

  *c. Sex Offender Treatment with Meg Kaplan, Ph.D. and Douglas Martinez, Ph.D.*

In July 2015, following a psycho-sexual evaluation discussed below, Mr. Cruz was

referred for individual sex offender treatment and cognitive behavioral therapy with Megan

Kaplan, Ph.D. Over the following year, Dr. Kaplan and Mr. Cruz met for dozens of sessions. *See* Ex. D. After their initial meetings, Dr. Kaplan suggested that Mr. Cruz would also benefit from group sex offender treatment. Thus, with her assistance, in August 2015, he began group treatment with Douglas Martinez, Ph.D. Mr. Cruz attended weekly group sessions with Dr. Martinez until the day he was remanded in September 2016. *See* Ex. E. The sessions were conducted according to the best practice standards of the Association for Treatment of Sex Abusers, of which Dr. Martinez is a member. *See id.* The essential elements of Mr. Cruz's treatment with Dr. Kaplan and Dr. Martinez included: (1) acceptance of responsibility, (2) exploring the origins of and prior rationalizations for wrongful behavior, (3) identifying triggers for wrongful behavior, (4) victim empathy, (5) relapse prevention, and (6) building and maintaining healthy relationships.

Both Drs. Kaplan and Martinez describe Mr. Cruz as highly motivated and hard-working and say he made significant progress. According to Dr. Martinez, "Mr. Cruz's insight into his own behavior is substantial at this point, and he has expressed remorse for the harm that has come of his actions….He is a very intelligent man, and the impact of what he has done is very clear to him. His remorse is credible, and is related to the harm that he did, rather than being due to his having been apprehended."  Ex. E at 2.

Mr. Cruz had to stop sex offender treatment when he entered the MDC. But both Dr. Kaplan and Dr. Martinez have visited him there and confirm he is doing well. "[H]e has worked diligently to maintain the progress that he has made in therapy," writes Dr. Kaplan, and continues to have an "excellent prognosis." Ex. D (Kaplan letter of June 14, 2017). "His insight and awareness of just how his errors in beliefs and negative emotions regarding himself have

created his deviant behaviors is a source of strength in moving forward with his life and no

longer engaging in past behaviors." Ex. E (Martinez letter of June 16, 2017).

     *d.   Summary*

     Since his arrest, Mr. Cruz has transformed from an anxious and private person, frustrated

by the loss of his career and lacking the strength to confront his past, into a focused and

determined patient, fully aware of his mistakes, with hope for the future and a will to succeed.

His rehabilitation "provides the most up-to-date picture of [his] 'history and characteristics,"

*Pepper,* 131 S.Ct. at 1242; *see also United States v. Bryson,* 229 F.3d 425, 426 (2d Cir. 2000)

("[A] court's duty is always to sentence the defendant as he stands before the court on the day of

sentencing"), and supports a significant downward variance under 18 U.S.C. § 3553(a). *See, e.g.,*

*United States v. Williams,* 65 F.3d 301, 305 (2d Cir. 1995) (approving extraordinary

rehabilitation as a permissible ground for departure); *United States v. Maier,* 975 F.2d 944, 947-

48 (2d Cir. 1992) (approving drug rehabilitation as a permissible ground for departure). *See also*

*United States v. Hawkins,* 380 F.Supp.2d 143, 165-66 (E.D.N.Y. 2005) (imposing sentence of

probation based on rehabilitation and stating: "what a defendant is doing while free is of great

significance in determining whether that defendant has made, or is in the process of making, a

success of her life. Rehabilitation should not now be destroyed by wanton and unthinking

application of mechanical rules for imprisonment") (internal citation omitted); *United States v.*

*Blake,* 89 F.Supp.2d 328 (E.D.N.Y. 2000) (departing in bank robbery case from 87-108 months

to several days in prison plus supervised release based on defendant's rehabilitation). Indeed, the

Court is "required, as a procedural matter, to consider evidence" of Mr. Cruz's rehabilitation in

deciding the appropriate sentence. *United States v. Preacely,* 628 F.3d 72, 81 (2d Cir. 2010).

Mr. Cruz is a changed man, retooled to live a stable and productive life. His sentence should reflect the extraordinary efforts he has made.

## 2.  **Mr. Cruz Has a Low Risk of Recidivism**

Second, Mr. Cruz's doctors believe that he is unlikely to reoffend. With the exception of Drs. Kaplan and Martinez, none of his current treatment providers had any professional relationship before this case, nor had they even meet. Yet they all agree that Mr. Cruz does not present a significant risk of future criminal activity. *See, e.g.,* Ex. C at 6 ("[w]ith ongoing treatment and appropriate monitoring, I strongly believe that he does not present a risk of harm to himself or the community"); Ex. E (Martinez letter of June 16, 2017 ("Mr. Cruz does not present as a risk to self or others, and I have a high degree of confidence that he does not present a risk for recidivism or any deviant sexual behavior").

Their beliefs are supported by the psycho-sexual evaluation and risk assessment of Dr. Richard Krueger, M.D., a board-certified psychiatrist and nationwide authority on sexual disorders. Dr. Krueger interviewed Mr. Cruz at length over three sessions and conducted the full battery of sexual behavior and risk assessment tests. He also spoke with Mr. Cruz's treatment providers and reviewed the discovery.

Dr. Krueger has diagnosed Mr. Cruz with the following sexual disorders: (1) a sexual disorder not otherwise specified, or hypersexual disorder, characterized by cybersexual behavior, (2) sexual masochism, and (3) a paraphilia not otherwise specified, characterized by ephebophilia, which is a sexual interest in teenagers, and fetishism, which consists of a foot fetish.  *See* Ex. F at 18. Dr. Krueger writes that "while sexual masochism, a sexual interest in young teenagers, and a foot fetish are not in themselves pathological, the fact that Mr. Cruz expressed these sexual interests through cybersexual involvement with minors, who cannot legally consent to sexual relations with an adult, is pathological and as such these should become

14

a focus of treatment." *Id.* at 18. Using the Clinical Global Impression Scale, developed at the National Institute of Mental Health, Dr. Krueger rated Mr. Cruz as "moderately ill" compared to the many thousands of individuals with sexual disorders he has previously evaluated. *Id.* at 9.

Importantly, Dr. Krueger believes "[i]t was the cybersexual interaction that excited Mr. Cruz, not the images he acquired." Ex. F at 19. While perhaps counterintuitive, Dr. Krueger's finding is supported by the available research. In February 2013, the Sentencing Commission released a report to Congress on the child pornography guidelines in which it confirmed that "not all child pornography offenders are pedophiles, and not all child pornography offenders engage in other sex offending." U.S. Sent'g Comm'n, *Report to the Congress: Federal Child Pornography Offenses* (2012) (hereinafter "USSC Report"), at 73. According to the Commission, approximately one in three offenders sentenced under the non-production Guidelines have engaged in "sexually dangerous behavior." *Id.* at 204-5. Many others have "non-sexual motivations for viewing child pornography," including "curiosity, compulsive collecting behaviors, avoidance of stress or dissatisfaction with life." *Id.* at 78.

Additional testing by Dr. Krueger revealed that Mr. Cruz's cybersexual behavior is "compulsive," but that—with treatment and medication—his degree of control has "increased substantially." Ex. F at 10. Moreover, based on (1) the results of five risk assessment tests (four of which predicted a low risk), (2) Mr. Cruz's successful participation in therapy, and (3) the absence of any inappropriate behavior since his arrest, Dr. Krueger has determined that Mr. Cruz's risk of recidivism is "very low." *See id.* at 20. Dr. Krueger writes that Mr. Cruz:

> has very successfully engaged in appropriate therapy, both to help him develop relationships and to decrease his deviate pattern of sexual arousal and not act on it. He reports in the past and now a significant amount of sexual interest in adults and markedly diminished interest in teenage males since his arrest and treatment and this is a very good prognostic factor.

*Id.* at 20.

Dr. Krueger's conclusions are reinforced by empirical studies, which show low recidivism rates for well-educated, first-time offenders, like Mr. Cruz, with strong family ties and access to mental health treatment. *See* U.S. Sent'g Comm'n, *Recidivism and the 'First Offender,'* at 14 and Ex. 6 (2004) (first time arrestees have a recidivism rate of just 6.8%); U.S. Sent'g Comm'n, *Measuring Recidivism: The Criminal History Computation of the Federal Sentencing Guidelines,* at 12 and Ex. 10 (2004) (hereinafter "*Measuring Recidivism*") (recidivism rates decline with education and family ties); USSC Report at 278 ("appropriate treatment interventions….are associated with lower rates of recidivism—some of them very significant").

Moreover, whatever Mr. Cruz's risk of recidivism, an increased term of imprisonment will have little, if any, impact. According to "the best available evidence,…*prisons do not reduce recidivism more than noncustodial sanctions*." Francis T. Cullen *et al.*, *Prisons Do Not Reduce Recidivism: The High Cost of Ignoring Science,* 91 Prison J. 48S, 50S (2011). Nor has the Sentencing Commission found a "correlation between recidivism and guidelines' offense level….While surprising at first glance, this finding should be expected. The guidelines' offense level is not intended or designed to predict recidivism." *Measuring Recidivism* at 15.

In fact, a lengthy sentence could be counterproductive. Once Mr. Cruz leaves the MDC, his sessions with Mr. Mercer will end, and he is unlikely to receive psychotherapy inside the BOP. According to a Bureau of Justice Statistics Report, only 24.0% of federal prisoners with mental health problems across the country receive treatment in prison, and only 15.1% receive professional mental health therapy. *See* Laurie E. Glaze and Doris J. James, *Mental Health Problems of Prison and Jail Inmates* 9, tbl 14 (Bureau of Justice Statistics Report Sept. 2006).

Even if Mr. Cruz was among the lucky few, successful therapy requires a strong counselor-patient relationship, and the development of such a relationship does not happen overnight. *See, e.g.,* JL Krupnick et al, *The Role of the Therapeutic Alliance in Psychotherapy and Pharmacotherapy Outcome: Findings in the National Institute of Mental Health Treatment of Depression Collaborative Research Program,* Abstract, The Journal of Consulting and Clinical Psychology (June 1996) ("Therapeutic alliance was found to have a significant effect on clinical outcome for both psychotherapies and for active and placebo pharmacotherapy.") Mr. Cruz has spent two years with Mr. Mercer. An unnecessarily lengthy interruption of their work together could pose a significant setback.

### 3. The Mandatory Minimum Sentence is Necessary to Prevent Unwarranted Disparities in Sentencing

Third, imposition of the mandatory minimum sentence is necessary to account for the important differences between Mr. Cruz's conduct and most other production offenders and to avoid unwarranted disparities in sentencing among similarly situated defendants. *See* 18 U.S.C. § 3553(a)(6) (sentencing courts required to consider "the need to avoid unwarranted disparities in sentencing among defendants with similar records who have been found guilty of similar conduct.")

The government indicted Mr. Cruz on multiple counts of production, possession and receipt of child pornography, but he pled guilty to just one count of receipt because his solicitation of pornographic photographs comprised the essence of his offense. The sentencing guideline for receiving child pornography is § 2G2.2. Here, however, because Mr. Cruz also "caused…a minor to engage in sexually explicit conduct," the cross reference in § 2G2.2 requires the use of guideline § 2G2.1. *See* U.S.S.G. § 2G2.2(c). The application of § 2G2.1 significantly increases Mr. Cruz's advisory guidelines range. Had Mr. Cruz been sentenced

under § 2G2.2, his advisory guidelines would be 63-78 months.[2] Under § 2G2.1, they are 135-168 months.

Guideline § 2G2.1 typically applies to cases involving the production of child pornography. In fiscal year 2010, for example, 83.8% of offenders (171 of 204) sentenced under § 2G2.1 were convicted of production offenses. *See* USSC Report at 251. Mr. Cruz's conduct satisfies the legal elements for production, but he was not convicted of a production offense and is relatively less culpable than most other production defendants. In the vast majority of production cases, the defendants are physically present with their minor victims or remotely aid and abet another adult offender in the commission of a sexual contact offense. *See id.* at 263, Fig. 9-10. Mr. Cruz was never present with his victims. He communicated with them online and never met—or sought to meet—them in person.

Many production cases also include minor victims engaged in sexual activity with adults. *See, e.g., United States v. Brown,* 843 F.3d 74, 83 (2d Cir. 2016) (defendant had repeated sexual contact with multiple victims and produced child pornography during the abuse); *United States v. Vonneida,* 601 Fed.Appx. 38, 41 (2d Cir. 2015) (videos recorded by defendant contained scenes of simulated killings accompanied by defendant's touching of partially nude minor victims, requests for masturbation, and masturbation); *United States v. Rafferty,* 529 Fed.Appx. 10, 13 (2d Cir. 2013) (defendant "caused a nine-year-old girl and an adult woman, who suffers from a mental defect, to engage in sexually explicit conduct with one another"); *United States v.*

---

[2] Mr. Cruz would begin at level 22. He would receive a 2-level decrease because his conduct was limited to receipt or solicitation, and he did not intend to traffic in, or distribute, the photos he received.  He would also receive a 5-level increase for a pattern of activity involving the sexual exploitation of a minor, a 2-level increase for use of a computer, and a 2-level increase for an offense involving less than 150 images, resulting in a total offense level of 31. *See* U.S.S.G. § 2G2.2. Subtracting 3 levels for acceptance of responsibility, his base offense level would be 26, and his advisory guidelines range would be 63-78 months.

*Holston,* 343 F.3d 83, 84 (2d Cir. 2003) (defendant recorded videos with minors, including one where he touched the genitals of a 10-year-old girl). Mr. Cruz never had sexual contact with a minor, nor did he solicit photographs of minors involved in sexual activity with others.

None of this negates the seriousness of Mr. Cruz's conduct, but it does distinguish his case from other production offenses. At the same time, however, the application of § 2G2.1 produces a guidelines range as high or higher than the sentences imposed in more serious matters, including sexual contact cases. In 2013, the mean sentence for cases in the "sexual abuse" category was 137 months, and the median was 120 months. *United States v. Jenkins,* 854 F.3d 181, 193 (2d Cir. 2014) (citing U.S. Sent'g Comm'n, *2013 Sourcebook of Federal Sentencing Statistics,* tbl 13). Should the Court impose a guidelines sentence here, Mr. Cruz will receive a similar punishment even though he never touched—or even met—his victims.

The most analogous case is *United States v. Anthony Weiner*, 17 Cr, 307 (DLC). Mr. Weiner pled guilty in this district to transferring obscene material to a minor in violation of 18 U.S.C. § 1470. During his guilty plea, he admitted to exchanging online messages and sending sexually explicit photographs to a 15 year-old-girl in North Carolina and to encouraging the girl to engage in sexually explicit conduct. He further acknowledged having compulsively engaged in sexual and non-sexual conversations with multiple women over many years. Like Mr. Cruz, Mr. Weiner never met the girl with whom he chatted. But because he sent her sexually explicit photographs, his guidelines are calculated under § 2G2.1. And, like Mr. Cruz, his advisory guidelines range is 135 to 168 months. *See* Ex. J at 2-3.

In Mr. Weiner's plea agreement, the government concedes the severity of the guidelines calculation and consents to a significantly reduced sentence:

> In light of the specific circumstances of the offense conduct in this case and because the
> substantially increased Guidelines range results from the cross reference to different

sections of the Guidelines, the Government submits that a sentence within the range of 21 to 27 months' imprisonment (which would be the application Guidelines range without the application of Cross-Reference 1 and Cross-Reference 2) would be fair and appropriate.

*Id.* at 4. The government has made no such concession here. Mr. Cruz faces a mandatory minimum sentence of 60 months, nearly three times the 21-month sentence recommended for Mr. Weiner.

Given the significant differences between Mr. Cruz's case and most other production offenses, and the close similarity between his case and Mr. Weiner's, the mandatory minimum sentence is sufficient, and indeed necessary to avoid unwarranted disparities in sentencing.

### 4.  <u>The Court Should Consider the Collateral Consequences of Mr. Cruz's Conviction in Determining a Just Punishment</u>

Fourth, imposition of the mandatory minimum sentence is sufficient in light of the collateral consequences of Mr. Cruz's conviction. The life that Mr. Cruz worked so hard to build vanished the instant he was arrested: He lost his job and his reputation; his photograph was displayed on websites nationwide; and he was isolated from his friends and colleagues at Bronx Science, who were strongly discouraged from contacting him.

And his arrest was just the beginning. In all likelihood, Mr. Cruz will never overcome his past. Inside the BOP, he will be recognized by other inmates, and the details of his offense will be known, making incarceration substantially more difficult, and possibly more dangerous, for him than the average prisoner. *See United States v. C.R.,* 792 F.Supp.2d 343, 517 (E.D.N.Y. 2011) ("[i]nmates who are known to be sex offenders are often viciously preyed upon by other inmates.") Upon his release, Mr. Cruz will be required to register as a sex offender, will probably lose his apartment and face challenges finding a job. He will be barred from voting and from

sitting on a jury, which are both central to his love of politics and debate. And because dozens of articles about his case are available online, he may never escape the stigma of his offense.

The Second Circuit clearly recognizes that collateral consequences bear upon the determination of "just punishment." *See United States v. Thavaraja,* 740 F.3d 253, 262-63 (2d Cir. 2014) (recognizing that deportation is a permissible factor for consideration at sentencing); *United States v. Stewart,* 590 F.3d 93, 141 (2d Cir. 2009) (affirming district court's decision to reduce sentence based on collateral consequences of conviction to defendant's career); *see also United States v. Nesbeth,* 188 F.Supp.3d 179, 194-95 (E.D.N.Y. 2016) (jail sentence unnecessary because defendant's inability to pursue a teaching career constitutes sufficient punishment). From a societal perspective, the collateral consequences Mr. Cruz faces may be justified. But their severity mitigates the need for a more lengthy prison term.

### 5.  <u>The Mandatory Minimum Sentence is Sufficient to Promote General Deterrence</u>

Finally, the mandatory minimum sentence is sufficient to promote general deterrence. The empirical research is unanimous that increased sentences do not reduce crime rates. "'[t]here is generally no significant association between perceptions of punishment levels and actual levels … implying that increases in punishment levels do not routinely reduce crime through general deterrence mechanisms.'" Sentencing Advisory Council, *Does Imprisonment Deter? A Review of the Evidence* (April 2011) at 14; *see id.* at 15 ("the studies on changes to sentence severity do not imply that punishment does not generate any deterrent effect at all. Instead, the authors demonstrate that the deterrent effect does not increase or decrease according to the actual punishment level to any substantial degree."). The government is more likely to accomplish general deterrence through the widespread publication of Mr. Cruz's arrest and prosecution, which has already been achieved. Everyone with a television or access to the internet has

witnessed Mr. Cruz's public humiliation, the collapse of his career, and his subsequent isolation from colleagues and friends. Thus, anyone who is considering a similar offense, but has the medical and mental wherewithal to resist such behavior, has already been deterred.

## V.

## CONCLUSION

For the above reasons, we respectfully request the mandatory minimum sentence of 60 months.

New York, N.Y.
June 21, 2017

/s/
_____

Steve Zissou
Deborah Colson
*Attorneys for Jon Cruz*